Commonwealth *v.* Gaito et al., Appellants.

Submitted April 13, 1961. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Frank M. Gaito,* appellant, in propria persona.

*Joseph Gaito,* appellant, in propria persona.

*William Claney Smith* and *Edward E. Fagan,* Assistant District Attorneys, and *Edward C. Boyle,* District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, June 15, 1961:

Defendants, Frank M. Gaito and Joseph Gaito, were indicted in Allegheny County on charges of (1) burglary, (2) assault with intent to kill, and (3) violation of the Firearms Act. They were tried before President Judge CLARK, of the Fortieth Judicial District, specially presiding, and a jury; and they were found guilty on all indictments. On the indictment for burglary, each defendant was sentenced to pay a fine of $500 and to serve a term of not less than ten years nor more than twenty years. On the indictment for assault with intent to kill, each defendant was sentenced to serve a term of not less than three and a half years nor more than seven years; sentences were to run consecutively. On the convictions under the Firearms Act, sentence was suspended on payment by defendants of costs of prosecutions. Motions for a new trial by both defendants and motion in arrest of judgment by Joseph Gaito were filed, argued before the court en banc, and denied. From the judgments of sentence, defendants have appealed to this Court.

The question raised in the court below on argument of defendants' motions for a new trial and the motion in arrest of judgment was the sufficiency of the evidence as to the identity of defendant Joseph Gaito. The following excerpts from the opinion of President Judge CLARK, for the court below, answer all questions which are properly raised in this Court:

"All of these cases were tried at the same time because of the fact that all of the charges have to do with the same set of circumstances.

"There had been a number of burglaries of homes in the vicinity of Dormont and Mt. Lebanon, in Allegheny County, Pennsylvania, the mode of operation of the burglars had been that they would evidently enter homes where there were no lights and where there was evidence that the parties were away from home. A

young Police Officer by the name of Gregory Scorza-fave, Jr., got an idea that if he would darken his home and hide himself in it that the burglars might attempt to burglarize his home. . . . As a result on February 27, 1959, Mr. Scorzafave took his family to some of his relatives, and he turned out the lights in his own home and then sat in his home. During the time that he was there two men came to his front door and rang the bell. He did not answer the bell. Later he went to the cellar . . . During the time he was in the cellar he noticed two men walk past his cellar window and look in the window. He noted at that time that the one man was considerably taller than the other. Later he went back up into the first floor of his home, and while there he heard someone climbing up the trellis work of his porch. After they climbed up the trellis onto the porch they smashed a window on the back door and then reached in to unhook the door, which in fact was not hooked. Two men entered his home. When they did the Police Officer turned on the electric light and immediately one of the men turned and shot the Policeman in the chest. The Policeman then shot at the men and the first time missed them; the second shot he hit one of the men whom he identified as Frank Gaito, one of the defendants. The Police Officer then tried to call on the telephone and passed into unconsciousness. Before the Police Officer regained consciousness, or before anyone else arrived, the two men who had entered his home both had disappeared. The Police Officer identified the second man as Joe Gaito, the other defendant. On the same evening that the shooting took place, or rather early the next morning, Frank Gaito was found outside of the Mercy Hospital in a critical condition with a bullet wound in him. He was taken into the hospital, and sometime later the bullet was removed from him. The bullet was taken to the Crime Laboratory. Persons from the Crime Labo-

ratory testified that they examined the marking on the bullet, and the marking on other bullets fired from the Policeman's gun, and that in their opinion the bullet taken from Frank Gaito was one which had been fired from the gun owned by Gregory Scorzafave, Jr. Swab tests were made by rubbing the hands of both Frank Gaito and Joe Gaito and then these swabs were examined by the Crime Laboratory, and members of the Crime Laboratory testified that these swabs showed that there was a residue of antimony, lead and barium. Joe Gaito had either recently fired a gun, or had in their opinion this showed that both Frank Gaito and Joe Gaito had either recently fired a gun, or had in their hands a gun which had been recently fired. Antimony, lead and barium are residue found as constituents of the primer which discharged a gun. The men from the Crime Laboratory testified it was most unusual to find a residue of all three of these ingredients in anyone's hand unless they had recently fired a gun or had a recently fired gun in their hands. Both defendants denied that they were in the Policeman's home. Frank Gaito claimed that on this particular evening he had been in what is known as the Hill District in the City of Pittsburgh, and he claimed that he was held up in the City of Pittsburgh, and was shot. When he came to the hospital there was a bullet wound in his stomach, but no bullet hole in his outer clothing. His explanation of that was that his clothes had been pulled up over his face before he was shot.

"Joe Gaito claimed he was either at his home or at his place of business during the time the burglary took place. In addition to the positive testimony of Officer Scorzafave and the Crime Laboratory testimony, Assistant District Attorney Strauss testified that on an occasion while Frank Gaito was in the hospital he had admitted to him that he was one of the burglars. . . . [In his] testimony Mr. Strauss states that Frank

Gaito told him the following: 'We went out there, we climbed over the porch, we went in through the back room, the kitchen; the fellow turned the light on, he was in the other room behind the door and he shot at me and I shot at him.' Mr. Strauss also testified that Frank Gaito refused to tell who was with him.

"Officer Dennis Timpona testified that Frank Gaito admitted to him that he had been in the home of Officer Scorzafave. . . . The officer testified that Mr. Frank Gaito gave him details of the crime without his asking Mr. Gaito about any of these details. At no time did Joe Gaito make any admission that he was in the home of Officer Scorzafave. When Joe Gaito was arrested and asked where he was on the night the burglary took place he told the Police Officers that he and Frank Gaito were together on that evening, and that they had been out at McKeesport trying to make a trade of an automobile. Mr. Joe Gaito later denied that what he told the Officer was the fact; he did not deny that he made such a statement, he said that he gave the Officers this false story so as to protect Frank if Frank was in some kind of trouble. . . .

"There is no question but what Joe Gaito never did admit to anyone that he was involved in this case. We do, however, have the positive identification of Gregory Scorzafave, Jr., that Joe Gaito was one of the men that was in the house. We cautioned the jury to consider carefully whether or not Officer Scorzafave had sufficient opportunity to observe Joseph Gaito so as to be able to identify him. In addition, of course, to the positive identification of the Officer we have the corroborative testimony of the Crime Laboratory to the effect that Joseph Gaito shortly before his hands were swabbed had in his hands a gun that was recently fired, or that he fired. We also have as corroborative testimony the statement given by Joe Gaito when he was first arrested, in which he placed himself at the time

of the burglary at a location which he later admitted was a false statement. . . .

"We believe that the evidence in this case was sufficient to justify the verdict of the jury. As to the question of identification, we point out what the Supreme Court has said in the case of Commonwealth v. Kloiber, 378 [Pa.] 412 [106 A. 2d 820]; Commonwealth v. Holden, 390 [Pa.] 221 [134 A. 2d 868]. There the Court states that, where the opportunity for positive identification of a defendant is good [and a] witness is positive in his identification and his identification is not weakened by prior failure to identify, but remains even after cross-examination positive and unqualified, the testimony as to identification need not be received with caution, and may be treated as a statement of fact. . . ."

On these appeals appellants attempt to raise questions concerning the admissibility of evidence and alleged prejudicial remarks of the district attorney. These questions were not properly raised in the court below and will not be considered on appeal. *Com. v. Gomori*, 192 Pa. Superior Ct. 325, 330, 161 A. 2d 649. We have reviewed the record and find that the evidence was sufficient to support the convictions. Appellants have not shown any error requiring the granting of a new trial.

Judgments of sentence are affirmed.